**Charles J. MUSSOLINE, as Guardian of the Property of the minor children of Carl and Joyce Stewart, Joyce D. Stewart, and Renee V. Stewart, as their interest may appear, Plaintiffs,**

**v.**

**Robert MORRIS, Acting Director, Federal Emergency Management Agency, Defendant.**

**No. 85–2297–CIV.**

United States District Court, S.D. Florida, N.D.

Sept. 22, 1987.

Robert Paige, H. James Catlin, Jr., William Tuttle, Miami, Fla., for plaintiffs.

Jeanne M. Mullenhoff, Asst. U.S. Atty., Miami, Fla., for defendant.

## FINAL JUDGMENT

ZLOCH, District Judge.

THIS MATTER was tried before the Court without a jury. The Court has considered the testimony and physical evidence presented at trial by both parties, argument of counsel of record and has considered the applicable case law. The Plaintiffs ask this Court to find that a flood as defined by the flood insurance policy in question occurred in the residence of the Plaintiffs and to award Plaintiffs damages accordingly.

The Court notes at the outset that it finds in favor of the Defendant and against the Plaintiffs on the basis that the Plaintiffs failed to establish by a preponderance of the evidence that a flood as defined by the flood insurance policy (Plaintiffs' Exhibit No. 10) occurred. The Court further notes that the testimony, documentary and other physical evidence presented by the Plaintiffs, are so conflicting that portions of the Plaintiffs' case is lacking in credibility.

In making the following Findings of Fact and Conclusions of Law, the Court analyzes the testimony of certain key witnesses for the Plaintiffs and attempts to show the glaring inconsistencies. The Court further notes that this Court does not have to make Findings with respect to every wit-

ness called to testify or every piece of documentary or other physical evidence received by the Court.

## FINDINGS OF FACT

1. The Plaintiffs have filed a Complaint and an Amended Complaint and the Defendant filed an Answer and Amended Answer. The Defendant raised certain Affirmative Defenses and the Plaintiffs filed a reply denying same.

2. In October, 1983, Carl S. Stewart and Joyce D. Stewart purchased a flood insurance policy to insure their residence located at 1039 Northeast 72nd Street, Miami, Florida. The building insured was described as a single-family residence, one floor, no basement. The building was insured for $102,500.00 and the contents on the first floor only were insured for $40,000.00. Both provisions were subject to $500.00 deductibles. The policy was purchased from the R.H. Popkin Insurance Agency, but was actually underwritten and administered by the Federal Emergency Management Agency (FEM), pursuant to the National Flood Insurance Program (NFIP). The policy term extended from October 25, 1983 to October 25, 1984.

3. On November 12, 1983, Carl S. Stewart died. In April, 1986, Joyce D. Stewart was convicted of the manslaughter of Carl S. Stewart. The minor children of Carl and Joyce Stewart, Renee Stewart, Constance Stewart, J. Paul Stewart and Katherine Stewart, all continued to reside at the insured residence.

4. In November, 1983, Robert Wolfe, Esquire, was appointed Personal Representative of the Estate of Carl S. Stewart, Deceased, by the Circuit Court of the Eleventh Judicial Circuit in and for Dade County, Florida. Mr. Wolfe thereafter employed the law firm of Leven and Fishman in his capacity as Personal Representative of the Estate of Carl S. Stewart, Deceased. Gary Brown, Esquire, was an associate lawyer with Leven and Fishman at all times material. Mr. Brown was the lawyer primarily responsible for advising Mr. Wolfe in Mr. Wolfe's capacity as Personal

Representative of the Estate of Carl S. Stewart, Deceased.

5. At the time of the alleged flood, the ages of the Stewart children were as follows: Renee Stewart—18; J. Paul Stewart—14; Katherine Stewart—13; and Constance Stewart—12.

6. Robert Morris is the Acting Director of the Federal Emergency Management Agency, which administers the National Flood Insurance Program.

7. Plaintiff, Renee Stewart, testified as follows:

(a) that it was raining Saturday night, May 26, 1984, when she went to bed around 11:30 p.m.;

(b) that she awoke the following Sunday morning, which date the parties stipulate was May 28, 1984, between 8:30 a.m. and 9:00 a.m., but was actually May 27, 1984;

(c) that there was water all over the downstairs of the home, high enough to cover the carpet on the entire first floor of the home;

(d) that she woke her brother and turned off the circuit breakers to the home because she was fearful of a fire due to standing water in the home;

(e) that it rained off and on during the day (Sunday) and maybe the rain stopped Sunday evening;

(f) that all rooms on the first floor had standing water except the kitchen which had puddles;

(g) that she, her brother and sisters and a friend started removing water from the home, that after about one and one-half hours, she noticed the water level decline and by 6:00 to 8:00 p.m. Sunday evening the water was pretty much out of the house. (See also deposition of Renee Stewart taken on March 26, 1987, Government's Exhibit No. 27, page 19).

8. The testimony of Renee Stewart set forth in Paragraph Nos. 7(e) and 7(g) totally contradicts the testimony of the Plaintiffs' witness, Mr. Charles Mussoline, who at the time of the incident was a friend of the family and in 1985 was court-appointed

as guardian of the property of the minor Stewart children. Mr. Mussoline testified:

(a) that he is presently employed as a law enforcement officer with Metro Dade Police Department and has been for the past seventeen years;

(b) that on Sunday, May 28, 1984, Renee Stewart called him, around Noon, stating that there was water in the house;

(c) that he informed her that he could not come over at that time since he had to report for duty at Jackson Memorial Hospital;

(d) that he arrived at the Stewart residence some time between 11:00 and 11:15 p.m. Sunday evening;

(e) that as he drove down 72nd Street toward the Stewart residence, that from a point just west of the Tippets' (neighbors of the Stewarts whose property is located on the opposite side of 72nd Street) property to the Stewart residence there was standing water in the street about half way over the tires of his truck which he was driving at the time;

(f) that when he arrived, Renee and Katie Stewart had brooms and a squeegie and were pushing water out the front door;

(g) that when he arrived he observed standing water inside the home around the front door area to be one to one and one-half inches deep, that as he went back toward the rear of the house, the water became deeper, that the bottom step of the steps outside the front door leading up to the front door, of which there are four (4) steps (See Defendant's Exhibit No. 15, page 1, photograph No. 2), was under water, that the spare, back bedroom and the brother's room had standing water four inches to ten inches deep, that you had to step down to go into the spare, back bedroom, that the Florida/family room had standing water approximately four inches deep, that water was coming in under the door leading from the Florida/family room out to the pool patio, that the pool was overflowing and that in the "piano room" water was being pushed out of this room as fast as it was coming in. This is the testimony of Mr. Mussoline of the condi-

tions at the Stewart residence between 11:00 and 11:15 p.m. Sunday evening when he arrived, whereas Renee Stewart testified on direct examination that by 6:00 to 8:00 p.m. Sunday evening the water was pretty much out of the Stewart residence.

9. At this point in the Court's Findings of Fact, the Court discusses Plaintiffs' Composite Exhibit No. 11 which consists of fifty (50) photographs taken by a friend of the Stewart family, Mr. Richard Bloom. Renee Stewart testified that she telephoned Mr. Bloom, a friend of the family and also a police officer, on Sunday around Noon and that Mr. Bloom arrived shortly thereafter. Miss Stewart further testified that Mr. Bloom took all of the photographs that made up Plaintiffs' Composite Exhibit No. 11.

10. On direct examination, Mr. Mussoline was shown Plaintiffs' Composite Exhibit No. 11 and he testified that these pictures reflect the conditions at or near the time of the alleged flood. The Court finds that Mr. Mussoline could not know this since he was not at the home during the flooding. The Court finds, as Renee Stewart testified, that the flooding ceased well before Mr. Mussoline had arrived.

11. Mr. Mussoline did testify that it rained heavily all day long on Sunday and that he had knowledge of this because he periodically stepped out of his office at Jackson Memorial Hospital. This contradicts the testimony of Renee Stewart as previously noted.

The Court further notes that Jackson Memorial Hospital is west of Interstate 95 and that no testimony or evidence was offered that Mr. Mussoline, when standing outside of Jackson Memorial Hospital, had a clear line of sight to the Stewart residence which is located several miles (at the minimum) to the east and north of Jackson Memorial Hospital and on Biscayne Bay.

12. In addition, Mr. Mussoline, on direct examination, testified that the Florida/family room which leads out to the pool patio had standing water three to four inches deep when he arrived. The Court finds that this is inconsistent with the testimony of Renee Stewart who said that the water

was pretty much out of the home by 6:00 to 8:00 p.m. Sunday evening.

13. Mr. Mussoline further testified that to open the Florida/family room door leading out to the pool patio, you had to exert force to push the door to get it open because of standing water "outside" the door. According to Renee Stewart, the water is out of the home by 6:00 to 8:00 p.m. Sunday evening and the alleged flooding condition had stopped; however, Mr. Mussoline testifies as to an entirely different condition existing at 11:00 to 11:30 p.m. Sunday evening.

14. Mr. Mussoline further testified that as best as he recalls the electricity was on in the house when he arrived there Sunday evening between 11:00–11:15 p.m. and remained on as long as he was there. Mr. Mussoline left around 1:00 a.m., Monday morning. The Court finds that this testimony is inconsistent with and contradictory to the testimony of Renee Stewart who testified that she and her brother turned off the circuit breakers because of standing water in the home and that she was afraid of a fire. The Court finds that the testimony conflicts as to why the electricity would be turned back on if there was one to ten inches of water in the home. If water reached a depth of ten inches in the home, this would put the water possibly higher than some electrical outlets existing in the home in various rooms on the first floor, creating a severe safety hazard which is the reason Renee Stewart testified she turned the breakers off in the morning. The Court further notes an obvious contradiction in the testimony as to why a trained police officer with seventeen years experience in law enforcement be walking around in water alleged to be one to ten inches deep with live electrical wiring being exposed to this alleged condition.

15. The Stewart residence sits on a peninsula with two (2) sides and part of a third side of the home fronting on the water.

16. Renee Stewart further testified that:

(a) she observed the pool overflowing on Sunday;

(b) the street in front of her home, Northeast 72nd Street, was completely inundated with water;

(c) that property across the street was covered by water;

(d) that the north side of her home had water running off and that there was no standing water;

(e) that the waters of Biscayne Bay were flush with the seawall in front of her home; and she observed waves coming over the seawall.

17. The testimony of Renee Stewart in Paragraph No. 16(e) above is inconsistent with her deposition testimony taken on March 26, 1987, where she testified on Page 22 that she did not remember how high the water was in the Bay.

18. Mr. Mussoline testified that when he arrived at the home he saw water "lapping" on the seawall, that water was overflowing the seawall and that the waters of Biscayne Bay were overflowing. Yet, Renee Stewart testified that the rain stopped some time Sunday evening.

19. Miss Stewart further testified that there was a terrible odor of salt water in the home.

20. Plaintiffs' Composite Exhibit No. 11 made up of fifty photographs, all taken, according to the testimony of Renee Stewart, by Mr. Richard Bloom, was later broken down by the Court into Court's Exhibit Nos. 1, 2 and 3. Upon questioning by the Court, after counsel for both parties had completed their examination of Renee Stewart, Renee Stewart testified to the Court that those photographs comprising Court's Exhibit No. 1 were taken "maybe" on Monday; that those photographs comprising Court's Exhibit No. 2 were taken "definitely" on Monday; and that those photographs comprising Court's Exhibit No. 3 were taken "definitely" on Sunday.

21. Yet, Miss Stewart testified that Richard Bloom took all of the photographs comprising Plaintiffs' Composite Exhibit No. 11 (Court's Exhibit Nos. 1, 2 and 3) and that he took these photographs on Sunday. There was no testimony by any witness

that Mr. Bloom returned to the Stewart residence on Monday and took additional photographs.

22. At the time of the trial, Renee Stewart was a student at the University of Miami, Coral Gables, Florida.

23. Mr. Richard Bloom was never called as a witness to testify.

24. None of the photographs which Renee Stewart testified were definitely taken on Sunday and which comprise Court's Exhibit No. 3 of Plaintiffs' No. 11 show "standing water."

25. The "guest house" at the time of the alleged flood was being rented out to airline stewardesses, none of whom testified.

26. Renee Stewart telephoned Robert Wolfe, Esquire, the Personal Representative of the Estate of Carl S. Stewart, Deceased, Sunday afternoon. She called his office and left a message on his answering machine regarding the alleged flooding.

27. Mr. Wolfe returned her call on Monday and told her to call the insurance company with which the Stewarts had their homeowner's policy, including flood insurance.

28. Miss Stewart telephoned Popkin Insurance Company with whom the flood insurance had been written and Popkin Insurance Company instructed Miss Stewart to call Allan Brodsky.

29. Miss Stewart signed a contract with Allan Brodsky, Plaintiffs' Exhibit No. 15 wherein she retained Mr. Brodsky as her "public adjuster" to handle the insurance matter in its entirety on her behalf and on behalf of her brother and sisters.

30. Mr. Brodsky likewise entered into a contract with Robert Wolfe, Esquire, on behalf of the Estate of Carl S. Stewart, Deceased.

31. Mr. Brodsky came to the house on May 30, 1984 and met with Mr. Fred Bethel, who was employed by the local representative for the National Flood Insurance Program.

32. Connie Stewart had a friend who stayed with the Stewarts over the weekend in question and helped clean the home. Renee Stewart testified that the friend remained at the house through Monday and Tuesday because the friend's mother could not drive down the street due to the water.

33. Renee Stewart testified that her brother and sisters did not go to school (the Lear School) because the school bus was unable to drive down the street to pick them up. Renee Stewart testified that the school bus was a "van type" and was larger than a car.

34. On cross-examination, Renee Stewart testified that Richard Bloom did not take any photographs of standing water. She further testified that she did not remember if there was standing water in the house when Mr. Bloom arrived. This testimony is inconsistent with and contradictory to Mr. Mussoline's testimony that there was water in the home between 11:00 and 11:15 p.m. Sunday evening, one to ten inches deep. Renee Stewart testified at her deposition on March 26, 1987 (Defendant's Exhibit No. 27, Page 19, lines 6 through and including 19; Page 20, lines 10 through and including 23) that water was still being pushed out of the house by herself and/or her brother and sisters and that they had all of the water out of the house by late that night (Sunday night).

35. The Court also notes that on Pages 14–15 of her March 26, 1987 deposition, Renee Stewart, in response to the question as to how deep the water was throughout the house, responded "... but it was definitely past my ankles through the whole house, but I wouldn't guess any more than that." At Pages 109–110 of her deposition, in response to a question as to how high the water level was at its maximum height, she stated that there were parts of individual rooms that were still relatively dry and that bedroom No. 4, as indicated on Government Exhibit No. 19, "... was dry because there was a big, big step up to get in there. So, the bedroom four was relatively dry ... I mean, no standing water." This is in direct contradiction to the testimony of Charles Mussoline who stated that he did not go the rear of the house when he arrived because the water was too deep to

go into the rear rooms, that there was from one to ten inches of water in the rear of the house.

36. On cross-examination, Renee Stewart testified that portions of the ceiling of the first floor suffered damage due to the alleged flood. Renee Stewart could not explain how flooding waters could reach the ceiling of the first floor!

37. On cross-examination, Renee Stewart testified that the only subsequent repairs made were to the roof area over the kitchen.

38. On examination by the Court, Renee Stewart testified that Dr. Dorothy Lear, at the time of the alleged flood, was the court-appointed guardian of the persons of the minor Stewart children. Renee Stewart further testified that she never telephoned Dr. Lear with respect to this alleged flooding incident. The Court notes that the minor Stewart children were attending the Lear School at the time of the alleged flooding incident. This is the same school that Renee Stewart testified that the minor Stewart children could not attend on the following Monday and Tuesday due to standing water in the streets.

39. On further examination by the Court, Renee Stewart demonstrated in court as to how deep the water was in the home by pointing to a point about approximately mid-ankle high on her right ankle, which the Court notes is three to four inches.

40. The Defendant presented testimony pursuant to Federal Rule of Evidence 609 that Renee Stewart was convicted in United States District Court in 1986 on three (3) separate counts of illegal possession of a firearm, 26 U.S.C. Section 5861(d) and one (1) count of illegal transfer of a firearm, 26 U.S.C. Section 5861(e).

41. Allan Brodsky testified on behalf of the Plaintiffs and was recognized by the Court as an expert in the field of insurance adjusting, not flood insurance adjusting. Mr. Brodsky was retained by Renee Stewart and by Mr. Wolfe to assist in the preparation of the insurance claim. Prior to this alleged incident, Mr. Brodsky had no prior experience in flood adjustment or flood in-

vestigation and has had none since. That is to say, that this was his only experience with the National Flood Insurance Program, flood adjustments and investigations.

42. Mr. Brodsky arrived at the Stewart residence on May 30, 1984 and met Mr. Fred Bethel who was the National Flood Insurance Program local representative.

43. Mr. Brodsky arrived at the Stewart residence on May 30, 1984 in his BMW Model 318, which he was able to drive down 72nd Street through any standing water and park in the circular driveway of the Stewart home.

44. Mr. Brodsky testified that there was no standing water in the home on May 30, 1984.

45. Mr. Brodsky testified that at this time (May 30, 1984) he and Mr. Bethel agreed on the experts to assist in cleanup and preservation of rugs, furniture, etc. The Court notes that Rug Beaters, Gunn & Gunn and Kopy Kat were the three (3) companies agreed upon by Mr. Brodsky and Mr. Bethel.

46. Mr. Brodsky then went on to testify that he saw maybe three (3) oriental rugs in the home and that Rug Beaters had already removed carpeting. The Court finds this testimony contradictory that Rug Beaters could have already removed carpeting before Mr. Brodsky first arrived at the Stewart residence on May 30, when his testimony is that he and Mr. Bethel had not even decided to use Rug Beaters prior to meeting at the Stewart residence on May 30, 1984. The Court finds that if Rug Beaters did remove carpeting, this had to be done on Monday (May 29, 1984), the day after the alleged flood on Sunday, the very day Renee Stewart testified that vehicles could not travel down 72nd Street to the Stewart residence.

47. Renee Stewart testified in her deposition of March 26, 1987, Page 33, that she had not called any carpeting company prior to the time of Mr. Brodsky first arriving at the Stewart residence.

48. On cross-examination, Mr. Charles Mussoline testified that when he arrived at the Stewart residence between 11:00 and 11:15 p.m. Sunday evening, he could see the end of the seawall and Biscayne Bay with the headlights from his vehicle and that the water was level with the seawall.

49. Mr. George C. Bolton testified as a witness for the Plaintiffs and was recognized by the Court as an expert in the profession of land surveying. Mr. Bolton owns his own company titled Biscayne Engineering Company, Inc.

50. Mr. Bolton's office, at his direction and supervision, prepared Plaintiffs' Exhibit No. 14, which is a "Specific Purpose Topographic Survey" which depicts a top view of the Stewart residence and surrounding properties.

51. Mr. Bolton testified that he had been retained by the Plaintiffs and personally visited the Stewart residence on May 13, 1987.

52. Renee Stewart told Mr. Bolton the height of the alleged standing water in the home on Sunday, May 30, 1984. Renee Stewart's statements to Mr. Bolton are the sole basis for Mr. Bolton's figures regarding the height of alleged standing water in the Stewart residence.

53. Plaintiffs' Exhibit No. 14 (Specific Purpose Topographic Survey done by Mr. Bolton) has a note that reads as follows:

"NOTE: Water rose up to 7.40 feet as per client observation."

54. Mr. Bolton was told by Renee Stewart that the alleged flood was from a rainfall and not from waters from Biscayne Bay or South Little River. Mr. Bolton testified he was also told this by Renee Stewart's counsel of record, Mr. Robert E. Paige. This is contradictory to the testimony of Renee Stewart and Charles Mussoline that there was "salt water" in the home as a result of the alleged flooding.

55. Mr. Bolton further testified that had he been told that waters from Biscayne Bay and/or South Little River had overflowed and intruded into the Stewart residence, that he would have taken a much different approach such as performing tidal studies, rainfall studies, checked the soil for its ability to absorb water and checked the water table elevations.

56. Mr. Bolton testified that the primary entrance for water into the Stewart residence would have been the pool/patio area which is sloped toward the Florida/family room and the Florida/family room door.

57. Mr. Bolton testified that based on his observations, measurements and the survey performed by his company, water would have to rise approximately four feet above the crown of 72nd Street just to reach the slab of the Stewart residence.

58. Mr. Bolton testified that in his opinion, water did not enter the home through the front door.

59. Mr. Bolton testified that the type of flooding at the Stewart residence and described to him would be unusual without Biscayne Bay and/or South Little River overflowing. Mr. Bolton testified that the kitchen should have been under water if the statements made by Renee Stewart to him regarding the height of standing water were accurate.

60. Mr. Roy Parmalee testified on behalf of the Defendant and at the time of the alleged flooding incident was the Regional General Adjuster for the National Flood Insurance Program in Florida, located in Tampa, Florida. He has experience in investigating over one thousand flood claims.

61. Mr. Parmalee was recognized by the Court as an expert in the field of flood insurance and flood-related claims.

62. Mr. Parmalee inspected the Stewart residence on December 4, 1984 (see Defendant's Exhibit No. 15).

63. Mr. Parmalee's expert opinion was that any water damage that occurred at the Stewart residence on May 30, 1984 was due to wind-driven rain entering the residence through door and window openings; that if water of the magnitude testified to by Renee Stewart and Charles Mussoline did in fact occur, the baseboards would be warped, the walls (plaster, drywall and paneling) would have been substantially dam-

aged and much greater than claimed, that wallpaper would have shown great damage, that you would have to replace plaster, sheet rock, paneling, trim and moulding and that the glue holding the paneling would have separated. Furthermore, a wood wall would have a black water line evident.

64. Renee Stewart told Mr. Parmalee that no repairs had been made at the Stewart residence between the alleged flood and his inspection because the Stewarts had no money to make any repairs.

65. Mr. Parmalee further testified that if salt water intrusion had occurred, damage to wood would have been much more noticeable and metal objects would have tended to rust more quickly.

66. Defendant's Composite Exhibit No. 17 are photographs developed from negatives provided by Plaintiffs to the Defendant. Plaintiffs' testimony shows that Defendant's Composite Exhibit No. 17 are photographs also taken by Richard Bloom, Renee Stewart's friend.

67. Defendant's Exhibit No. 17(C) clearly shows lack of maintenance around the front, bay window of the Stewart residence which Renee Stewart said was repaired *after* the alleged flood.

68. Defendant's Exhibit No. 17(A) clearly shows severe cracking in a wall of the Stewart residence as a point of entry for water into the Stewart residence. Also, cracking is seen directly under the window.

69. Mr. Parmalee's conclusion was that the claim by the Stewarts is suspect, there was no compensable flood insurance claim, and that the entire file should be referred to the Office of the Inspector General for further investigation.

70. Mr. Herb Gopman was called as a witness for the Defendant. Mr. Gopman has been a registered, professional engineer in the State of Florida since 1967. He is a structural engineer and was recognized by the Court as an expert in the field of structural engineering.

71. Mr. Gopman inspected the Stewart residence on May 12, 1987. Mr. Gopman did not inspect the second floor on the inside of the Stewart residence.

72. Mr. Gopman inspected the outside of the residence and did not observe any water damage to any partitions or to the structure.

73. Mr. Gopman found no evidence inside the Stewart residence of wallpaper delaminating and no evidence of decomposition of plaster at the baseboards.

74. Mr. Gopman observed caulking failures around the exterior of the building.

75. Mr. Gopman's expert opinion is that the water entered the Stewart residence through walls, windows or ruptured roofing membrane and not by flooding.

76. Mr. Gopman further testified that cracking observed in the walls of the Stewart residence or under windows or around doors would not be caused by "settlement" as the Plaintiffs contend in light of the fact that the Stewart residence is constructed on pilings.

77. The Court finds that the Plaintiffs have failed to establish by a preponderance of the evidence that a general condition of flooding occurred as defined by the policy (Plaintiffs' Exhibit No. 10), statutes and regulations, *and* that the insured premises was flooded by the overflow of tidal waters or the accumulation of surface waters as opposed to wind-driven rains.

78. The equities are with the Defendant and against the Plaintiffs and Judgment shall be entered accordingly.

## CONCLUSIONS OF LAW

1. The Court has personal jurisdiction over the parties hereto and over the subject matter herein pursuant to 42 U.S.C. Section 4072.

2. The Standard Flood Insurance Policy (SFIP), pursuant to 42 U.S.C. Section 4121, insures against all direct losses caused by flood. The term "flood" is specifically defined in the policy, including Article II of the subject policy, in pertinent part, as follows:

A. A general and temporary condition of partial or complete inundation of normally dryland areas from:

1. The overflow of inland or tidal waters.

2. The unusual and rapid accumulation or runoff of surface waters from any source.

The policy also *excludes* certain losses:

### ARTICLE III

We only provide coverage for direct, physical loss by flood which means we do not cover:

A. Losses from other casualties, including:

1. Loss caused by theft, loss of profits, fire, *windstorm, wind,* explosion, earthquake, land sinkage, land subsidence, landslide, gradual erosion, or any other earth movement except such mudslides (i.e. mudflows) or erosion as is covered under the peril of flood. (emphasis added)

2. Loss caused by rain, snow, sleet, hail, *water spray,* freezing, thawing, the pressure or weight of ice or water, sewer backup and seepage of water *unless your property, has been, at the same time damaged by a flood.* (emphasis added)

3. *Water or moisture damage resulting primarily from any condition substantially confined to the insured building or from any condition which is within your control* (including but not limited to design, structural or mechanical defects, failures, stoppages or breakages of water or sewer lines, drains, pumps, fixtures or equipment.) (emphasis added)

B. Losses of the Following Nature:

3. A loss from a flood which is confined to the premises on which your insured property is located, unless the flood is displaced over two acres of the premises.

3. In addition, the regulations which were promulgated pursuant to the National Flood Insurance Act, 42 U.S.C. Section 4001 et seq., and which were in effect at the time of the insurance policy was purchased in October of 1983, specifically limit coverage. Title 44, Code of Federal Regulations, Section 61.4 provides:

(a) All flood insurance made available under the Program is subject:

(1) To the Act, the Amendments thereto, and the Regulations issued under the Act;

(2) To the terms and conditions of the Standard Flood Insurance Policy, which shall be promulgated by the Administrator for substance and form, and which is subject to interpretation by the Administrator as to scope of coverage pursuant to the applicable statutes and regulations;

(3) To the specified limits of coverage set forth in the Application and Declarations page of the policy; and

(4) To the maximum limits of coverage set forth in Section 61.6.

(b) Insurance under the Program is available only for loss due to flood, as defined in Section 59.1 of this subchapter.

*The policy covers damages from a general condition of flooding in the area* which results from other than natural causes, such as the breaking of a dam, but does not cover damage which results from causes on the insured's own property or within his control or *from any condition which causes damage, which condition is substantially confined to the insured's premises or properties immediately adjacent thereto.* (emphasis added)

4. Plaintiffs were informed on the very face of the policy that the premises were insured subject to the terms of the policy, the National Flood Insurance Act, 42 U.S.C. Section 4001, et seq., and the regulations. (Title 44, Code of Federal Regulations). Therefore, the plaintiffs are bound not only by the terms of the policy, but by the terms of the statute and the applicable regulations. Furthermore, federal law governs the legal operation of the exclusionary language of policies of insurance issued pursuant to the National Flood Insurance Act. *Mason Drug v. Harris,* 597 F.2d 886, 887 (5th Cir.1979).

5. Thus, the burden of proof falls to the plaintiff to establish that there

was a general condition of flooding with respect to the subject premises on May 27, 1984, which means that plaintiff must demonstrate that the flooding was not substantially confined to the insured premises, or to properties immediately adjacent thereto. As the plaintiffs have stipulated that the insured premises comprise less than two acres of land, the specific policy provision which excludes loss from a flood confined to the premises on which the insured property is located, unless the flood is displaced on two acres of the premises, is inapplicable.

6. In support of their argument that a general condition of flooding existed, plaintiffs introduced evidence (Plaintiffs' Composite Exhibit 9) in the form of a Miami Herald newspaper article dated Wednesday, May 30, 1984 that the Miami "area" experienced a record amount of rain on May 27 and 28, 1984, and that Renee Stewart observed that the street in front of the insured premises was under water. While this may be so, the Court determines that the correct focus must be upon the plaintiffs' immediate neighborhood, rather than the Miami area, and upon the amount of damage sustained by neighborhood premises, to determine whether a general condition of flooding was present. Obviously, uniform amounts of rain do not fall over the Miami "area", and differences in topography create wide differences in flooding potential. *See Bull's Corner Restaurant, Inc. v. Director of FEMA,* 759 F.2d 500, 503 (5th Cir.1985):

7. The Plaintiffs have failed to demonstrate that a general condition of flooding existed. Plaintiffs have clearly failed to demonstrate that water entered the insured premises as a result of the overflow of inland or tidal water, or the accumulation of surface waters. (See Findings of Fact above).

8. Furthermore, assuming arguendo that the insured premises were flooded under the terms of the policy, the condition was clearly confined to the insured premises, and thus exempt pursuant to Article III(B)(3) of the policy, and to 44 C.R.R. Section 61.4(b).

In *Segal v. Great American Insurance Co.,* 390 F.Supp. 1074 (E.D.N.Y.1974), the Court found that in order to establish that a condition of flooding is covered under the Standard Flood Insurance Policy, the plaintiff must demonstrate that the flooding is shared by more than one property and its adjacent properties. The Court found that although the plaintiff established that her house was flooded, and that flooding occurred nearby, she failed to establish that the immediately adjacent properties were flooded, and therefore failed to establish that the flood was not substantially confined to her premises. As the Plaintiffs have failed to demonstrate that the property immediately adjacent to the insured premises was flooded (and there is adjacent property to the immediate west and to the northwest of the insured premises) the Plaintiffs have failed to demonstrate that the flood was not confined to their premises, and thus excluded under the policy provisions and regulations.

In *Bull's Corner Restaurant,* the Court found that evidence that *only* the insured premises and one adjacent property suffered water entry as a result of unusually heavy rains, failed to demonstrate that the flooding was not substantially confined to the insured premises. The loss was therefore excluded under the SFIP.

9. Thus, in order to avoid exclusion, a claimant must demonstrate that flooding as defined by policy and statute occurred to the insured premises, adjacent premises (unless the insured premises is at least two acres) *and* nearby property in the immediate vicinity. Although this burden is considerable, this requirement clearly comports with the intent of Congress and serves public policy.

10. Article III(A)(2) of the policy provides that the Plaintiffs may not recover for damages caused by rain, or water spray unless the property has been, at the same time, damaged by flood. The Court has found that the Plaintiffs have failed to demonstrate that a general condition of flooding occurred as defined by the policy, statutes and regulations, *and* that the in-

sured premises was flooded by the overflow of tidal waters or the accumulation of surface waters, as opposed to wind-driven rains. Therefore, the Plaintiffs may not recover under this policy term.

Based on the Findings of Fact and Conclusions of Law set forth above and after due consideration, it is

ADJUDGED that Final Judgment be and the same is hereby entered in favor of the Defendant, Robert Morris, Acting Director, Federal Emergency Management Agency, and against the Plaintiffs, Charles J. Mussoline, as Guardian of the Property of the minor children of Carl and Joyce Stewart, Joyce D. Stewart, and Renee V. Stewart, as their interest may appear, and the Plaintiffs shall take nothing by this action and the Defendant shall go hence without day. The Court reserves jurisdiction solely for the purpose of awarding any attorneys' fees and costs that may be appropriate.